**People of the State of Illinois, Plaintiff-Appellee, v. Willie Pearson, Defendant-Appellant.**

**Gen. No. 54,178.**

First District, Second Division.

June 2, 1970.

Gerald W. Getty, Public Defender of Cook County, of Chicago (Justine I. Knipper and James J. Doherty, Assistant Public Defenders, of counsel), for appellant.

Edward V. Hanrahan, State's Attorney of Cook County, of Chicago (Elmer C. Kissane and Joseph Romano, Assistant State's Attorneys, of counsel), for appellee.

MR. PRESIDING JUSTICE McCORMICK delivered the opinion of the court.

Two indictments were returned against the defendant, Willie Pearson, one charging him with taking indecent liberties with Cora Rambert, and the other charging him with taking indecent liberties with Beverly Rambert. The indictments were consolidated, and at a bench trial the defendant was found guilty of both charges. After a

hearing in aggravation and mitigation, the trial court sentenced the defendant to not less than ten nor more than twenty years in the penitentiary.

The evidence on which the conviction was obtained was testimony by Beverly Rambert, who was ten years old at the time of the trial, and Marshall Rambert, who was eight. These two children, with Cora Rambert, were present when the defendant committed the criminal acts; however, at the time of trial, Cora was in a mental institution.

The defendant raises many issues on appeal; one, that he was not proved guilty beyond a reasonable doubt. He argues that the two children were not competent to testify against him, and that the trial court committed reversible error in allowing the children to testify over defendant's counsel's objection. Defendant further urges that the testimony of Beverly was uncorroborated and not clear and convincing. His reasonable doubt issue is thus twofold; first, he says the children should not have been allowed to testify, and that without their testimony there would have been no case against him. Second, that even if the testimony were accepted, it does not contain the clear narration required before a court can conclude that a defendant has been proved guilty beyond a reasonable doubt.

The defendant also asserts that the trial court committed reversible error when it refused to allow his pretrial motion to suppress certain evidence (two knives) which had been taken from his bedroom. Finally, he urges that the trial court unduly restricted the cross-examination of the children's mother, Geraldine Rambert.

■ ■ The law is now well settled that it is not the age of the child, but rather the child's intelligence, ability to comprehend the meaning of an oath, and to speak the truth which determine if the child is competent to

testify. In People v. Davis, 10 Ill2d 430, 140 NE2d 675, at 436, the court said:

> "If the witness was sufficiently mature to receive correct impressions by her senses, to recollect and narrate intelligently, and to appreciate the moral duty to tell the truth, she was competent. Not age, but the degree of intelligence of a child, determines the question of the child's competency. (Shannon v. Swanson, 208 Ill 52; State v. Segerberg, 131 Conn 546, 41 A2d 101.)"

The appearance and conduct of the child on the witness stand are factors which assist in evaluating the child's · intelligence. These are factors which are obviously not subject to review, and consequently, after a trial court has ruled on the competency of a child, that ruling will stand, unless it appears that there was a manifest abuse of discretion.

██ The defendant does not disagree with the above principles; however, he asserts that an abuse of discretion did occur when the trial court allowed both children to testify, since he believes that neither child was qualified to do so under the Davis test. The question as to whether or not a child witness is competent to testify in cases involving indecent liberties, presents a perplexing problem, since without such testimony there would rarely be convictions. Nevertheless, a man cannot be found guilty on incompetent testimony, and the State's "inability to produce it [proper evidence] cannot throw the door open to the receipt of improper evidence; . . . ." State v. Segerberg, 131 Conn 546, 551, 41 A2d 101, 103.

██ The defendant points out certain portions of the testimony of each child which he claims shows that the children were incompetent to testify. We have carefully reviewed all of the testimony given by the children, and have concluded that those isolated instances cited by the defendant in which he charged that the children were

170

unresponsive or failed to comprehend certain questions, were very few, and in nearly all the instances the matters were cleared up by a simple rephrasing of a question. We have also found that several quotations brought to our attention are not damaging when put into context. For example, defendant's brief contains the following regarding the testimony of Beverly:

> "When asked by the State's Attorney to identify the knife which was alleged to have been shown to her she first merely answers 'Yes.' When asked 'What color was it?' She answers, 'It was a straight knife.'"

From this version it would appear that the child failed to understand the questions asked of her or was not intelligent enough to give responsive answers. However, when reading the actual testimony, quite a different impression is produced:

The Court: "And then what happened next?"

Witness: "Then he went and got the—He pulled out that knife. It was in a little—"

Mr. Lynch: Q. "Now, will you describe for His Honor what that knife looked like, the knife he pulled out at this time."

A. "Yes."

Q. "What color was it, if you remember?"

A. "It wasn't a black knife. It was a straight knife."

From this context the child's "Yes" does not appear as unresponsive as the defendant would have us believe. Furthermore, the child had first been asked to describe the knife, not just its color. She was then asked the color and answered that it was not black, that it was straight. This is quite different from the somewhat distorted version the defendant has set out in his brief.

Beverly indicated that she knew she was under oath and that she would be punished if she did not tell the truth. She knew her correct address at the time of trial; she knew the name and address of the school she attended; and she knew her aunt's home address. There was testimony about some grease, and when asked if she recalled the type of container it was in, she answered, "Well, Royal Crown Hair Grease," and indicated that the container was red. When the Assistant State's Attorney handed her several exhibits for identification she corrected him, saying, "Wait a minute. I think these go together. That's the the way he give it to my sister. Somebody must have tore it. That goes like that." The Assistant State's Attorney then indicated for the record that Beverly was correct.

■ The defendant stresses the fact that Beverly did not know the seasons of the year, yet when asked if she knew when winter came on, she associated it with Christmas, saying, "Sometimes it snows" at Christmas. She did know all the days of the week, and although she showed some confusion about telling time, when questioned patiently she was adequately able to express sequences in a sensible manner. We think it irrelevant that the child did not know the word "breast," since she knew that the defendant had sucked on that part of her body which she later learned was called a breast. Defendant makes much of the point that Beverly admitted that until the day before the trial she had not known that "God will punish you" if you don't tell the truth. The critical factor is that at the time she was on the witness stand she understood the importance of telling the truth, and it is unimportant that she only recently came to understand that fact.

■ We see no purpose in detailing the testimony of Marshall Rambert; it is enough to say that the objections against it are much the same as those made against Beverly's testimony, and we find the objections un-

172

founded for the same reasons. The boy made insignificant errors which were in no way related to his ability to tell the truth, and which did not warrant the conclusion that he was not intelligent enough to testify. He well understood what it meant to lie; he said it meant to tell a story, and when asked what he meant by that he said, "Your mother tell you not to go out and you go out, and she say, 'Where you been?' You say, 'I didn't go out.'" He further indicated that he knew he would be punished if he lied.

The trial court was well within its discretion in ruling that the children were competent to testify.

■ Defendant also asserts that the trial judge abused his discretion and that he assumed the role of an advocate, taking the attitude of trying to assist the prosecution. That assertion is wholly unfounded. The fact is that the trial judge was dealing with children of tender years, and it was, therefore, totally proper for him to examine them to ascertain their competency to testify. We believe the judge, rather than abusing his discretion, acted quite properly under the circumstances; it would have been improper for him to have ruled before he had conducted an examination such as he did. He asked questions which, if answered unsatisfactorily, would have resulted in his ruling that the children were not competent to testify. We believe the defendant's real complaint is that the judge elicited the truth, that the children were competent.

An alternative argument of the defendant is that even if the testimony had been properly admitted it was not clear and convincing, and that it contained contradictions. From Beverly's testimony it appears that early in the evening of November 18, 1966, Mrs. Rambert had sent Marshall, Beverly and Cora to their aunt's home to pick up some draperies. Marshall was seven, Beverly was nine, and Cora was eleven years old at the time. On the way home the defendant called to them from across the

173

street and asked them to come into his apartment to see his bike which he would sell them. When they went in, the defendant (known to the children as Mr. Speedy) locked the door, took them into the bedroom, and ordered Beverly and Cora to take a bath. The girls went into the bathroom and locked the door. When they came out he ordered Beverly to remove her blouse and he sucked her breasts. He then told her to get some grease; she first refused, but when he pulled out a knife, she complied. She testified as follows:

> "I went and got the grease, and he took a little grease on his hand, his finger, and he told me to go put the grease back. And when I put it back on the dresser where I got it from, he took the grease and rubbed it on my private. And then I told him it hurt, and he took his finger out. And then he called my sister Cora and told her to take off her blouse. And then when my sister took off her coat and blouse, he sucked my sister's breast and rubbed her seat."

Here we must point out that the defendant's argument that there was no corroboration of Beverly's story is based solely on a comparison with Marshall's testimony. However, Mrs. Rambert testified that Cora was taken to a hospital for examination after the incident; that Cora's breasts were bruised, and her nipples and vagina were red. She further testified that the girls' blouses were disheveled and partially unbuttoned when they returned home, although they had been neatly dressed when they had left earlier.

When two police officers arrived after Mrs. Rambert's call, they cruised the area with the children until they showed them the building in which the defendant lived. After being admitted to the apartment the police allowed the defendant to change his clothes to go to the station. While in the bedroom the officers saw the two

knives in plain view and took them. Earlier the children had mentioned the two knives when telling of the incident.

Despite defendant's protestations to the contrary, Marshall's testimony does substantially corroborate that given by Beverly; he relates that while they were returning from their aunt's home the defendant stopped them and asked if they would like to come into his apartment to see his bike. He states that the defendant then locked the door and took the children into the bedroom where he ordered Beverly to remove her blouse. When she refused he pulled a knife on her. Marshall did answer that the knives shown to him at the trial were not the ones he had previously seen. However, he clearly testified that the defendant had pulled a knife on Beverly, which fact was far more important than his ability as an eight-year-old to have remembered exactly what the knife looked like, especially when the incident had occurred almost four months prior to the date of the trial.

Marshall testified that the defendant had ordered his sisters to take a bath; that they went into the bathroom; that the defendant sucked his sisters' breasts. The defendant correctly points out that when asked if defendant had displayed his privates, the boy answered that he had not. Beverly had testified at some length that the defendant exposed himself; however, she never testified that Marshall touched the defendant or even saw the defendant expose himself. She did say that the defendant exposed himself while sucking Cora's breasts, after which he had asked Marshall to play with his privates. She never testified that Marshall complied, and in fact, it appears that he did not, since both children testified that the defendant was on the bed and Marshall on a couch facing a television. Furthermore, the defendant was not charged with having taken indecent liberties with Marshall, and when asked whether he had seen the defendant's privates, Marshall had specifically answered he had not. We repeat, his answer is not in-

175

consistent with Beverly's testimony that the defendant had exposed himself. She said, "Marshall, he wanted to get out. Marshall was mad, so he turned his head. He wasn't looking at television." This would imply that Marshall was not watching closely the events occurring in the bedroom, and only occasionally turning to see what happened on the bed. It is thus probable that he was not looking at the time the defendant had exposed himself, and was even more unwilling to turn around when asked to come to the defendant.

While there was only limited testimony regarding placement of those present in the bedroom, we believe the above testimony satisfactorily explains what might have appeared as contradictions.

The defendant argues that the seizure of the two knives from his apartment was illegal in that the scope of the search which disclosed the knives was too broad; that the officers had no warrant with them, and thus the question is whether the search, as incident to a lawful arrest, was permissible. We would first point out that the very use of the word "search" is really inappropriate here since it connotes an active seeking out of evidence or weapons. The knives were both in plain view and were observed by the officers who were in the bedroom while the defendant changed his clothes to go to the police station.

Ill Rev Stats 1967, c 38, § 108–1(d) provides:

"When a lawful arrest is effected a peace officer may reasonably search the person arrested and the area within such person's immediate presence for the purpose of:

". . .

"(d) Discovering any instruments, articles, or things which may have been used in the commission of, or which may constitute evidence of, an offense."

176

In its decision in Chimel v. California, 395 US 752, the United States Supreme Court in no way renders the above statute invalid. The case does attempt to clarify "immediate presence," and further adds that an arresting officer may seize items not only for the purpose of securing evidence of an offense, but also for the purpose of protecting himself and preventing escape. At pages 762–763 the court said:

"When an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape. Otherwise, the officer's safety might well be endangered, and the arrest itself frustrated. In addition, it is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction. And the area into which an arrestee might reach in order to grab a weapon or evidentiary items must, of course, be governed by a like rule. *A gun on a table or in a drawer in front of one who is arrested can be as dangerous to the arresting officer as one concealed in the clothing of the person arrested. There is ample justification, therefore, for a search of the arrestee's person and the area 'within his immediate control'—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence.*" [Emphasis supplied.]

 In People v. Doss, 44 Ill2d 541, 256 NE2d 753, the Supreme Court found that a revolver and money found in the defendant's clothing under the bed occupied by defendants at the time of arrest was clearly within the "immediate control" of the defendants, as that phrase was outlined in Chimel. In the instant case the knives were in plain view and, therefore, make a stronger case

177

of proper seizure than that presented in Doss. The trial court properly denied the motion to suppress.

The defendant's final complaint is that the trial court unduly restricted cross-examination of Mrs. Rambert. There had been some testimony elicited from her indicating that Cora had been the source of some difficulty; that Cora had run away on occasion, and Mrs. Rambert had reported her missing between six and ten times, although the child had always returned home at night. Cora had apparently been detained at least once in the Audy Home, and had also been expelled from public school for striking a teacher. Mrs. Rambert testified that she had punished her children for coming in late.

The State objected to the line of questioning by defense counsel, and counsel admitted that he was attempting to discredit the credibility of Cora's report to her mother of the incident, although he had first stated he was trying to show that Cora had little moral conviction. The trial judge then sustained the objection on the ground that it was improper to impeach the credibility of one who was not even going to testify.

The defendant argues that there is a relationship between the credibility of Cora and that of the two children who testified at the trial; that Cora had fabricated the story of defendant's activities to avoid punishment, and the other two followed her lead. The defendant then concludes that by exposing Cora's possible reason for lying he could attack the credibility of Beverly and Marshall. This argument is rather novel and fails to take into account the basic fact that Beverly and Marshall testified at the trial and were directly subject to impeachment. Defendant's theory that by impeaching the absent Cora he also impeached Beverly and Marshall, is based upon a very tenuous premise; namely, that the testimony of Beverly and Marshall was perjured in order to conform to the story supposedly created by Cora. If the credibility of the children

178

was susceptible to attack it could and should have been directly attacked.

■■■ We find the trial court ruled correctly in limiting defendant's cross-examination of Mrs. Rambert since the line of questioning was primarily aimed at impeaching the credibility of a witness who was not even present at the trial and whose version of the events was not offered in evidence. If the defendant wanted to impeach the two children who did testify he should have done so directly.

For the reasons stated, we find there were no errors committed at defendant's trial which would require the granting of a new trial, and we further find he was proved guilty beyond a reasonable doubt. The judgment of the Circuit Court is affirmed.

Affirmed.

LYONS and BURKE, JJ., concur.